IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Mary L. Loeffler-Boggia,                )
                                        )
            Plaintiff,                  )       NO. CV 07-335-TUC-FRZ (JM)
                                        )
    v.                                  )       REPORT AND RECOMMENDATION
                                        )
                                        )
Michael J. Astrue,                      )
Commissioner of Social Security,        )
                                        )
            Defendant.                  )
_____)

 Plaintiff Mary L. Loeffler-Boggia brought this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision by the Commissioner of Social Security.  This Social Security Appeal has been referred to the United States Magistrate Judge pursuant to Local Rule – Civil 72.2(a)(10) of the Rules of Practice of this Court.  Based on the pleadings of the parties and the record submitted to the Court, the Magistrate Judge recommends that the District Court, after its independent review, deny Plaintiff's Motion for Summary Judgment [Doc. No. 14] and grant Defendant's Cross-Motion for Summary Judgment [Doc. No. 21].

## I.  Procedural Background

 On January 4, 2000, Plaintiff filed an application for disability insurance benefits, alleging a disability onset date of October 8, 1999, due to immune toxicity-gluteraldehyde

induced toxic encephalopathy, fibrositis and polyneurapathy.  (Tr. 17, 105-108.)[1]  The application was denied at the hearing level on July 16, 2001.  (Tr. 52-63.)  The Appeals Council vacated the hearing decision and remanded for a new hearing.  (Tr. 792-94.)  In a decision dated December 16, 2006, the ALJ found that Plaintiff was not disabled because she could perform her past relevant work.  (Tr. 17-31.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision.  (Tr. 8-11.)  Plaintiff then commenced this action for judicial review pursuant to 42 U.S.C. § 405(g).

## II.  Record on Appeal

### A.  Plaintiff's Testimony

At the January 16, 2001, hearing before the ALJ, Plaintiff testified that she was born on September 21, 1953, was 5-8" tall, and weighed 216 pounds.  (Tr. 808.)  She has a bachelor's degree and master's degree in nursing.  (Tr. 809.)  She lives in a mobile home in Marana with her husband.  (Tr. 809-10.)  Her husband does not work because he has macular degeneration.  (Tr. 814-15.)

Plaintiff stopped working in October 1999 after a contractor performed renovations and sprayed her work place with chemicals.  (Tr. 810, 826.)  After that, she had chronic fatigue and reacted to the smell of aftershave, perfumes, car exhaust, plastics, polyester and "anything that was man-made."  (Tr. 810-11, 813.)  She would become flush and then extremely tired and weak after few hours, have difficulty breathing and would get rashes.  (Tr. 811-12.)  After the exposure at work, she "was in full-blown chronic fatigue syndrome where [she] was in bed for 10 months."  (Tr. 811.)  At the time of the hearing, she was "out of bed for about three to four hours a day . . . ."  (Tr. 811.)

Plaintiff grew organic vegetables and performed gardening work in her back yard.  (Tr. 818.)  During the morning hours, she would mainly be in bed, but would get up intermittently to do a load of laundry or the dishes.  (Tr. 815.)  Later in the day, she did minor

---

[1]"Tr." refers to the official transcript of the administrative record.

2

chores, cared for her birds and dogs, and wandered around the yard picking up after her dogs. (Tr. 811 & 815.)

During the second hearing on August 3, 2004, Plaintiff testified that her condition had deteriorated in that she was more depressed than she had been in January of 2001. (Tr. 829.) In the intervening years, much of her support system crumbled. (Tr. 829.) The onset of her reaction to chemicals was a little bit more delayed than previously, but she still tired within two or three hours after an exposure. (Tr. 830.) Plaintiff would lie down several times per day (Tr. 833), could not handle stress and would "lose it" mentally. (Tr. 817.)

**B. Medical Evidence**

**1.    Michael R. Gray, M.D.**

Beginning in December 1997, Plaintiff began treating with Michael Gray, M.D., for complaints of chemical sensitivity, fatigue, wheezing and depression due to chemical exposure at the work place. (Tr. 436-454.)

In February 1999, Dr. Gray wrote a letter to Plaintiff's employer stating that she was "exquisitely sensitive" to various chemicals and compounds, and that she "must be considered disabled although she is really not impaired to the point where she is unable to work." (Tr. 426.) Dr. Gray recommended that Plaintiff be accommodated by allowing her to work in areas not contaminated with chemicals and scents that might exacerbate her conditions. (*Id.*) Dr. Gray also administered trigger point injections that improved her respiratory function and decreased the severity of her headaches, but reportedly increased her fibromyalgia symptoms and caused her vertigo. (Tr. 392, 399.) On May 27, 1999, Dr. Gray reported that Plaintiff showed "significant improvement of several conditions since she started on her trigger point injections." (Tr. 387.) Dr. Gray administered additional injections and scheduled Plaintiff to return in two weeks. (*Id.*)

On June 14, 1999, Plaintiff told Dr. Gray that her migraines were "reasonably well controlled," but that the injections "seem to increase fatigue." (Tr. 385.) Plaintiff stated that she "ends up being sick for 10-14 days" after smelling her supervisor's perfume. (*Id.*) Dr.

Gray identified her problems as immune toxicity, toxic encephalopathy, fibromyalgia, and migraines and repeated trigger point injections.  (*Id*.)

On September 28, 1999, Plaintiff reported that her employer had sprayed the work place with an insecticide and began remodeling, and complained of increased symptoms of fatigue, confusion, weakness, memory and concentration problems, sinus problems, joint swelling and muscle pain, twitching and chest discomfort. (Tr. 415.)  Dr. Gray reported that Plaintiff had great difficulty with frequent walking, standing for longer than one hour, performing postural movements, and lifting more than 10 pounds, as well as interacting with people, and maintaining a regular work schedule. (Tr. 416.)  Dr. Gray opined that it was difficult for Plaintiff to work during the remodeling and that when it was complete Plaintiff "can decide whether she wishes to return to work at that time." (*Id*.)  He also continued her on Neurontin. (*Id.*)

On October 14, 1999, Plaintiff told Dr. Gray that "she is unable to work" or "carry out household activities." (Tr. 412.)  She was reported to be "somewhat fatigued," but had an otherwise unremarkable physical examination. (Tr. 413.)  Dr. Gray continued her medications and stated that she was temporarily totally disabled "with the likelihood that this may become permanent, as I am still unaware of any way that we can desensitize the immune system . . . ." (Tr. 413.)  On October 28, 1999, Plaintiff provided similar symptom complaints. (Tr. 408-09.)  She reported that she drove to a concert in Phoenix, which "decrease[d] her overall well being." (Tr. 409.)

On February 17, 2000, Plaintiff complained to Dr. Gray of dizziness, seeing flashing lights, asthma, fibromyalgia, disorientation, headaches and difficulty with keeping track of things. (Tr. 364.)  Dr. Gray repeated his opinion that Plaintiff was disabled. (Tr. 366.)

On August 1, 2000, Dr. Gray reported that Plaintiff "continues to be significantly symptomatic and impaired with regard to her ability to carry out activities of daily living and employment." (Tr. 506.)  He recommended that Plaintiff avoid irritants and that she "continue to pursue her efforts at getting a just adjudication of her comp claims and her

1  disability status." (*Id.*)

2      In December of 2000, Dr. Gray completed a "Fatigue Residual Functional Capacity
3  (RFC) Questionnaire" at the request of Plaintiff's attorney.  (Tr. 470-71.)  The doctor
4  reported that Plaintiff suffered from moderately severe to severe fatigue, depending on
5  chemical exposure and prior exertion, and that Plaintiff was unable to sustain work activities
6  on a regular and continuing basis. (*Id.*)

7      On January 10, 2001, Dr. Gray reported that a pulmonary function test was normal,
8  but that Plaintiff still should use an anti-inflammatory inhaler.  (Tr. 663.)

9      On January 30, 2001, Dr. Gray completed a "Medical Assessment of Ability to Do
10  Work-Related Physical Activities," and opined that Plaintiff could sit for no more than 2
11  hours, stand no more than 1 hour, and could walk for no more than 1 hour during an 8 hour
12  workday.  (Tr. 475.)  He reported she could lift up to 50 pounds occasionally, but never
13  more, and that she could occasionally carry up to 20 pounds, but never more.  She could not
14  squat or climb at all, but could occasionally bend, stoop, crawl, and reach.  (*Id.*)

15      Between March and December 2001, Plaintiff followed-up with Dr. Gray four times.
16  (Tr. 613-62.)  Plaintiff's symptom complaints remained largely consistent with those of her
17  previous visits.  (Tr. 615-20, 640-51, 654-59.)  Dr. Gray noted in March that lab reports
18  showed immune toxicity.  (Tr. 661.)  Plaintiff told Dr. Gray in December that she traveled
19  to Utah and "did reasonably well, went to Vegas when the population was low and was able
20  to walk for about three hours."  (Tr. 614.)  Dr. Gray continued to prescribe Neurontin and
21  dietary supplements.  (Tr. 613-62.)

22      Between April and November 2002, Plaintiff followed-up with Dr. Gray three times.
23  (Tr. 746-52.)   Her symptoms remained largely the same, as did her treatment and
24  prescriptions.  (*Id.*)

25      Between April 2003 and February 2004, Plaintiff followed-up with Dr. Gray three
26  times.  (Tr. 710-17.)  She indicated that she had traveled to New York in September.  (Tr.
27  714.)  Plaintiff made substantially the same symptom complaints as on previous follow-ups.

28                                    5

(Tr. 710-17.)  Dr. Gray continued to prescribe Neurontin and dietary supplements.  (*Id*.)

On July 14, 2004, Dr. Gray completed a "Medical Assessment of the Patient's Ability to Perform Work Related Activity," and found "moderate" to "moderately severe" limitations in responding to instructions and customary work pressures.  (Tr. 743-44.)

## 2.    Robert Crago, Ph.D.

Between February and July 1999, Plaintiff treated with B. Robert Crago, Ph.D., at Neurobehavioral Health Services in Tucson.  (Tr. 268-309.)  In February, Dr. Crago examined Plaintiff upon referral from Dr. Gray, who diagnosed her as "suffering from multiple chemical sensitivities secondary to glutoaldehyde exposure." (Tr. 296.)  Dr. Crago stated that EEG testing results were consistent with multiple chemical sensitivity and/or toxic encephalopathy, that standardized testing showed that Plaintiff had a low attention span given her intelligence, was probably brain damaged, had above average intelligence, and normal personality testing.  (Tr. 298-99.)  Dr. Crago diagnosed cognitive disorder not otherwise specified and adjustment disorder with mixed emotional features of depression and anxiety.  (Tr. 299.)  In June, Dr. Crago initiated "cognitive rehabilitation," consisting of "audio/visual stimulation" and "nutritional supplements" to "'boost' the overall arousal level of her brain."  (Tr. 290-91, 293.)  Plaintiff reported improved concentration and comprehension while reading (Tr. 287), that she was "doing well" (Tr. 275) and that treatment "has been really beneficial" (Tr. 272).  In July, Plaintiff reported that she had difficulty multitasking, but that she was "clearer," and Dr. Crago opined that she was "much improved."  (Tr. 268.)

On May 3 and 5, 2004, Dr. Crago examined Plaintiff for complaints of depression, and opined that Plaintiff was unable to work because she would be an unreliable worker due to reactions to environmental toxins.  (Tr. 741.)  Dr. Crago's suggested treatment consisted of "cognitive behavioral techniques" including "thought stopping, thought substitution, and positive visualization," as well as "learning to go with the flow" to cope with her chronic illness.  (Tr. 741.)

Dr. Crago prepared a Disability Evaluation of Plaintiff in June 2004, and reported that the symptoms of depression had greatly increased. (Tr. 735.) He diagnosed mood disorder secondary to physical condition and cognitive disorder not otherwise specified. (*Id*.) Dr. Crago assessed a global assessment of functioning (GAF) score of 50, which indicated "severe restrictions in social and occupational functioning." (*Id*.)

On June 15, 2004, Dr. Crago examined Plaintiff for her complaints of cognitive and emotional problems. (Tr. 732.) Plaintiff subjectively complained of fatigue, depression, poor concentration and memory and stress. Dr. Crago opined that Plaintiff would have "good and bad days" and would be unreliable as a worker. (Tr. 735.) Dr. Crago diagnosed a mood disorder and cognitive disorder not otherwise specified. Dr. Crago opined that Plaintiff had several moderately to markedly limited mental activities. (Tr. 737-40.)

### 3.    Grace Ziem, M.D.

On January 25, 1999, Plaintiff completed a Health and Environmental History questionnaire for Grace Ziem, M.D., in Baltimore, Maryland.[2] Plaintiff complained of "memory losses in work" and that she was "unable to have any home life." (Tr. 429.) By circling entries on a list, Plaintiff stated that she had daily or almost daily confusion, memory problems, slurred words, dizziness and fatigue. (Tr. 430.) Plaintiff also indicated her medical condition interfered "[a] lot" with her ability to climb stairs, standing for longer than one hour, bending, thinking clearly while doing arithmetic, doing household chores and going to public places. She also reported moderate interference with twisting, remembering and following instructions, writing and typing for more than an hour, driving in traffic, carrying and lifting, walking, interacting with people and maintaining a regular work schedule. (Tr. 432.) Plaintiff listed her goals for the visit as, "What are chances for going on disability," and "Legal action/Johnson & Johnson." (Tr. 434.)

---

[2]The follow-up questionnaire supplements a previous questionnaire completed on December 30, 1997. (Tr. 238-255.)

On March 28, 2000, Plaintiff completed a "Follow-Up Health & Environmental History Questionnaire" for Dr. Ziem. (Tr. 353.) Plaintiff stated that she had daily weakness, muscle twitching, confusion, memory problems, slurred words, low energy, wheezing, muscle and joint discomfort. (Tr. 354.) She had difficulty with standing, postural movements, sitting, thinking clearly, remembering and following instructions, carrying more than 15 pounds, walking, interacting with people and maintaining a regular work schedule. (Tr. 356.)

On March 28, 2001, Plaintiff traveled to Maryland for an examination with Dr. Ziem. (Tr. 533.) Plaintiff coughed during the examination, but Dr. Ziem documented clear lungs. (Tr. 534.) Plaintiff had no signs of fibromyalgia, but had "disturbances" with heel and toe walking, "indicating neurologic impairment," and a moderate impairment with vibratory perception, "indicative of peripheral neuropathy." (Tr. 535.) Plaintiff had reduced attention span and short term memory. (*Id*.) Dr. Ziem opined that she "does indeed have brain damage" exacerbated by chemical exposure, as well as exacerbated reactive airway disease, exacerbated chronic fatigue, severe difficulty with thinking and remembering, and difficulty with lifting, walking, and carrying objects. (*Id*.) Dr. Ziem indicated that Plaintiff was disabled. (*Id*.)

### 4.   Terry Allen Brown, M.D.

On October 12, 1999, Terry Allen Brown, M.D., performed an independent medical examination of Plaintiff in connection with her workers compensation claim wherein, she claimed she became ill after exposure to the chemical glutaraldehyde during her nursing duties in the mid-1980s. (Tr. 311, 315.) Dr. Brown reviewed Dr. Gray and Dr. Crago's treatment records (Tr. 311-13), as well as other records. (Tr. 131-14.) Plaintiff stated that she was "100% disabled by fatigue (Tr. 317), brought on "after cologne exposure" at work, which caused "fatigue so that she can barely walk" to her car to drive home. (Tr. 316-17.) Plaintiff complained that "strong odors" aggravated her chemical sensitivity, which produced swollen glands, muscle aches, cognitive problems and reading difficulty. (*Id*.) Plaintiff

reported that her husband "cooks and cleans" and that she had no activities outside of work. (Tr. 318.)  At times, she would walk one mile per day.  (*Id*.)  On examination, Plaintiff was reported to be an "excellent historian, to the extent that it appeared to contradict any memory problems," and her "recall was excellent and rapid." (Tr. 318.)  Plaintiff had mild tenderness in her shoulders, but "no classic myofascial disease."  (Tr. 318-19.)  Neurological examination was normal.  (*Id*.)  In relation to Dr. Gray's practice, Dr. Brown stated that, "[w]hile Dr. Gray no doubt considers his practice to be on the cutting edge, I would describe it more as 'fringe' medicine with little to no correlation between diagnoses and the 'scientific evidence' upon which they are based." (Tr. 319.)

### 5.    Raymond Schumacker, M.D.

On February 8, 2000, Raymond Schumacker, M.D., examined Plaintiff and reviewed her medical records.  (Tr. 551, 554-555.)  Plaintiff stated that she reacted to any scents, as well as car fumes and personal care products, but did not react to pets, flowers or plants. Plaintiff stated that she was reacting to something in the doctor's office "following casual mention by [the] receptionist of new carpet installation next door." (Tr. 551.)  Plaintiff stated that "at her best, which occurs only after she has spent four days in her house with the air purifier on, she is still fatigued," and she can only lift four bags of grass in one day.  (*Id*.) She could prepare meals, wash dishes and care for her animals.  (*Id*.)  Plaintiff reported that her mood was "not good," but did not report further symptoms other than "economic circumstances" and "getting no pay." (Tr. 553.)  On examination, Plaintiff "repeatedly sighs" in a "dramatic fashion." (*Id*.)  Plaintiff was alert and had "rapid thought processes." (*Id*.)  Coordination was reported as normal, nasal passageways were unobstructed, and muscle strength and sensation were intact.  (Tr. 553-54.)  Plaintiff had wheezing on forced expiration which was described as a "characteristic of glottic closure." (Tr. 554.)  Plaintiff had limited tender points.  (*Id*.)  Dr. Schumacker found no objective findings related to Plaintiff's non-specific symptoms and stated that clinical examination did not indicate the presence of fibromyalgia.  (Tr. 555.)

Dr. Schumacker stated that "Dr. Gray's opinions on the interpretation of various antibody tests and lymphocyte cell population counts are by no means accepted by immunologists, allergists, toxicologists, and infectious disease specialists." (Tr. 555-56.) He also stated that "it is not difficult to imagine that, when coupled with the anger and resentment to which [Plaintiff] freely admits, such symptoms may well be magnified into a panoply of prolonged symptoms, especially when there are physicians who are willing to certify the symptoms as indicative of a specific compensable and disabling disease." (Tr. 556.) Dr. Schumacker believed Plaintiff's condition was a "self-fulfilling prophesy" and that there was "no objective clinical evidence of an immune disorder." (Tr. 558-59.)

### 6.  Janet Van de Voorde, Ph.D.

On March 8, 2000, Janet Van de Voorde, Ph.D., performed a psychological evaluation of Plaintiff. (Tr. 323.) Plaintiff stated that she became ill after her employer sprayed an insecticide in 1999. (*Id*.) Plaintiff reported that she filed a federal workers compensation claim, a claim against the contractor, and an EEO claim against the hospital director who did not evacuate the hospital at the time of the spraying. (Tr. 324.) Plaintiff reported that she had nine dogs, and for daily activities, Plaintiff said she "work[ed] outside," as well as dusted, vacuumed and cooked, and then would lie down. (*Id*.) Plaintiff reported that she had good sleep and appetite. (*Id*.) Dr. Van de Voorde described Plaintiff as having poor eye contact, but that she was clear, coherent and fluent, with appropriate mood, affect the thought associations. (*Id*.) Plaintiff had good concentration and judgment. Plaintiff was alert and "able to comprehend and follow instructions and complete tasks assigned to her." (*Id*.) Plaintiff generally "worked carefully and quickly." (*Id*.) Dr. Van de Voorde noted that Plaintiff's performance on memory testing showed "no errors" and that the findings elicited that day as well as by Dr. Crago "seem to be at odds with Dr. Crago's conclusion that [Plaintiff] was showing 'overall decline in cognitive abilities.'" (Tr. 325.)

Dr. Van de Voorde documented "entirely normal cognition and memory functions" on mental status examination. (Tr. 325.) She noted that when Plaintiff was told her memory

was being tested, in that she would be required to read a paragraph and then be asked to reproduce it, Plaintiff stated "that this was going to show her poor memory." (Tr. 325.) Plaintiff had to be encouraged to give any response at all, and stated after she read the paragraph that she had "no clue" but then produced minimal recall of content. (Tr. 325-26.) Dr. Van de Voorde stated that Plaintiff's performance "stood out as being inconsistent with her responsiveness and active participation throughout the rest of the interview and testing which measured memory in many different ways without being as obvious as this one item." (Tr. 326.) Dr. Van de Voorde opined that Plaintiff's "other scores were Superior and Very Superior in rote and immediate attention," and that her "only poor performance appeared to be related to the lack of attention and effort, given her other excellent scores" which "were entirely within the normal range of expectation." (Tr. 326.) Dr. Van de Voorde also documented that Plaintiff "performed steadily for three hours and did not complain of nor show any evidence of weakness or fatigue." (*Id*.) Dr. Van de Voorde reported her diagnostic impression as "[n]o psychiatric diagnosis." (*Id*.)

### 7.    Other Examining Physicians

On July 26, 2000, Stuart Lanson, M.D., examined Plaintiff. (Tr. 610.) Plaintiff reported having sinus problems, neurological problems, odor sensitivity, fatigue and decreased memory and cognitive function. (Tr. 611.) Physical examination was mostly within normal limits ("WNL"), except for a dry tongue and red and blanched nasopharynx. (*Id*.) Dr. Lanson recommended other testing to determine the best treatment options. (Tr. 612.)

In February 2001, Plaintiff saw Pamela Morford, M.D. (Tr. 477.) Dr. Morford noted that Plaintiff has sustained "immune and neurological injury from glutaraldehyde while working in . . . 1982-85." (*Id*.) Dr. Morford also noted Plaintiff's exposure to a pesticide while working in Sells and found that Plaintiff had "increased problems with reactive airway disease, heart palpitations, nausea, vomiting, atypical migraines, fibromyalgia, joint pains, frequent optic scleritis, short term memory problems, multi-tasking problems, panic attacks,

and disorientation." (*Id.*)  Dr. Morford stated that "[a]t the current time [Plaintiff] is totally disabled due to the disregard of the contractor, and the administration of the Sells Hospital." (*Id.*)

On March 1, 2001, Gerald Altschuler, M.D., performed a consultative internal medicine examination and a review of Plaintiff's medical records.  (Tr. 460-65.)   On examination, Plaintiff demonstrated "good insight and good memory." (Tr. 462.)  Physical, musculoskeletal and neurological examination was unremarkable. (Tr. 462-63.)  Although Plaintiff stated that she would be unable to tandem walk due to "toxic encephalopathy and its effect on balance," Plaintiff was able to walk tandemly and on heels and toes without difficulty, and perform other coordination testing, such as heel-to shin and finger-to-nose maneuvers, hopping and squatting, without difficulty.  (Tr. 463.)

Dr. Altschuler noted that with regard to chemical sensitivity, Plaintiff "at the present time has no evidence of mucus membrane irritation nor does she have any evidence of asthma," and that there was "a lack of documentation of asthmatic treatment." (Tr. 463.) Dr. Altschuler also noted that he found no evidence of neuropathic encephalopathy on examination.  (*Id.*)  He stated that Plaintiff's symptoms, such as memory problems, low energy, fatigue, pains and palpitations, were "products of an overall somatization syndrome that is ingrained in a patient that has underlying psychological problems." (*Id.*)  He noted that Plaintiff was "in the medical profession' and involved in ongoing litigation.  (*Id.*)  Dr. Altschuler stated that Plaintiff "seeks medical gain from her many symptoms and she is reinforced by questionable medical practice and testing." (Tr. 463.)  The doctor found no evidence of chemical sensitivity given his independent examination and review of the medical records, and could perform work activity.  (Tr. 464.)

On February 18, 2003, Plaintiff traveled to New Mexico to see Raymond Singer, Ph.D., who performed a neuropsychological, behavioral and toxicological assessment of Plaintiff, upon Dr. Ziem's referral. (Tr. 666.)  Plaintiff complained of memory problems, chronic fatigue and chemical sensitivity. (Tr. 668.)  Plaintiff reported that she required rest

after sewing for two hours or doing housework, had migraines with double vision two to three times per day, groin pain that prevented her from walking, and fatigue, asthma and joint pain when exposed to chemicals, typically when she goes grocery shopping. (Tr. 674.) Dr. Singer administered testing, reviewed medical records, and opined that Plaintiff had brain dysfunction. (TR. 679-80.)

On June 9, 2004, Plaintiff underwent a consultative physical examination by Dennis Thrasher, M.D. (Tr. 722.) Plaintiff reported that she "has to do some care giving for her husband who is disabled with macular degeneration." (Tr. 723.) She drives, does the shopping and sews, but becomes very tired after an hour. (*Id*.) On examination, Plaintiff was tearful, but in no apparent distress, and she had normal gait and posture, and could sit, stand and walk without difficulty. (*Id*.) Plaintiff was oriented, alert and maintained good eye contact. (*Id*.) Plaintiff's mucus membranes were unremarkable. (Tr. 724.) She had good air movement in her lungs, had no muscle atrophy or wasting, and her sinus problems were stable. (Tr. 724-25.) Dr. Thrasher believed that much of Plaintiff's medical records were geared toward establishing causation or proving multiple chemical sensitivity rather than trying to make her symptoms better. (Tr. 725-26.) Dr. Thrasher stated that Plaintiff "has had numerous diagnostic and treatment interventions that are not supported by mainstream scientific medicine," and that she "has not undergone medical evaluation to rule out many of the more common treatable afflictions." (Tr. 726.) Dr. Thrasher did not find "that she has any objective evidence of physical impairment aside from her chronic upper airway problems which preclude her ability to work around upper airway irritants." (*Id*.) Dr. Thrasher opined that Plaintiff appeared to be depressed and have a possible somatization disorder, but stated that he "would leave that diagnosis to a psychiatrist evaluation." (*Id*.)

On July 27, 2004, Plaintiff was seen at Southern Arizona Ear, Nose & Throat and a previously ordered MRI was reported as "perfectly normal." (Tr. 745.)

On August 23, 2004, Jill Caffrey, Ph.D., performed a consultative psychometric examination on Plaintiff. (Tr. 753.) Dr. Caffrey reviewed Plaintiff's medical records and

noted that there was "significant differing in opinions among the doctors" who had treated and examined Plaintiff.  (*Id.*)  Plaintiff told Dr. Caffrey that her mental symptoms were related to her toxic exposure.  (*Id.*)  Plaintiff had six dogs and cats.  (Tr. 754.)  She sewed and cooked during the day, with rest breaks.  (*Id.*)  On examination, Plaintiff was tearful, but cooperative, and "dramatic in her presentation."  (*Id.*)  Plaintiff subjectively complained of memory problems, but formal testing showed average to high-average intelligence and memory.  (Tr. 756.)  Dr. Caffrey diagnosed a major depressive disorder with somatization to be ruled out and opined that Plaintiff had slight to marked impairments in responding to coworkers and the work setting due to "variable endurance, perceive or actual."  (Tr. 756-58.)  Dr. Caffrey also opined that Plaintiff's ability to understand, remember and carry out instructions was unimpaired.  (Tr. 757.)

### C. ALJ's Findings and Decision

After considering the entire record and testimony, the ALJ found that the medical evidence established that the Plaintiff had the following medically determinable impairments: "remote history of excess exposure to glutaraldehyde with development of mucous membrane symptoms requiring three surgical procedures, chlorpyriphos exposure at work in September 1999, tenderness in the paracervical muscles, trapezii and paraspinal muscles of the neck and back, history of palpitations, tachyarrhythmia, and possible mitral valve prolapse, well controlled with medication, history of upper respiratory reactive airway disease with normal spirometry testing, atypical migraine headaches, and history of mild episcleritis/scleritis without pain . . . ."  (Tr. 30.)  However, he concluded that "she did not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulation No. 4."  (*Id.*)  The ALJ also found that Plaintiff "had additional mental/emotional impairments which were not severe for 12 continuous months or more, and which were not shown to have resulted in any significant functional limitation for the requisite duration."  (*Id.*)

The ALJ proceeded to find that the Plaintiff's impairments could reasonably cause the

14

pain or other symptoms alleged. (*Id*.) However, he concluded that, "[t]he evidence does not show that her symptoms were fully credible, and she was not precluded from engaging in substantial gainful activity through her date last insured." (*Id*.) Additionally, he found that she had "no physical limitation through her date last insured, and she was subject to an environmental restriction consisting of the need to avoid respiratory irritants . . . ." (*Id*.) The ALJ concluded that Plaintiff's impairments did not prevent her from performing her past relevant work as an office nurse. (*Id*.)

Based on these findings, the ALJ reached the following decision:

> It is the decision of the Administrative Law Judge that, based on the application filed effective on January 4, 2000, the claimant is not entitled to a period of disability or disability insurance benefits under Sections 216(i), 223, respectively, of the Social Security Act.

(Tr. 31.)

## III.   Applicable Legal Standards

### A.   Sequential Evaluation Process

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process to be followed by the ALJ in a disability case. *See* 20 C.F.R. § 404.1520. At step one of the process, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity; if so, a finding of non-disability is made and the claim is denied. 20 C.F.R. § 404.1520(b). When the claimant is not currently engaged in substantial gainful activity, the ALJ, in step two, must determine whether the claimant has a severe impairment or combination of impairments significantly limiting him from performing basic work activities; if not, a finding of non-disability is made and the claim is denied. 20 C.F.R. § 404.1520(c). A severe impairment or combination of impairments exists when there is more than a minimal effect on an individual's ability to do basic work activities. 20 C.F.R. § 404.1521(a); *Smolen*, 80 F.3d at 1290. Basic work activities are "the abilities and aptitudes necessary to do most jobs," including physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling, as well as the capacity for seeing,

1   hearing and speaking, understanding, remembering and carrying out simple instructions, use

2   of judgment, responding appropriately to supervision, co-workers and usual work situations,

3   and dealing with changes in a routine work setting.  20 C.F.R. § 404.1521(b).

4     At the third step, the ALJ must compare the claimant's impairment to those in the

5   Listing of Impairments, 20 C.F.R. § 404, Subpart P, App. 1; if the impairment meets or

6   equals an impairment in the Listing, disability is conclusively presumed and benefits

7   awarded.  20 C.F.R. § 404.1520(d).  When the claimant's impairment does not meet or equal

8   an impairment in the Listing, in the fourth step, the ALJ must determine whether the claimant

9   has sufficient "residual functional capacity" despite the impairment or various limitations to

10  perform her past work; if so, a finding of non-disability is made and the claim is denied.  20

11  C.F.R. § 404.1520(e).  When the claimant shows an inability to perform past relevant work,

12  a prima facie case of disability is established and, in step five, "the burden shifts to the

13  Commissioner to show that the claimant can perform some other work that exists in

14  'significant numbers' in the national economy, taking into consideration the claimant's

15  residual functional capacity, age, education, and work experience." 20 C.F.R. § 404.1520(f).

16    **B.** **Standard of Review**

17    A district court's review of a disability determination is limited, and a final

18  administrative decision can be revised "only if it is based on legal error or if the fact findings

19  are not supported by substantial evidence." *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir.

20  1987) (citation and internal quotations omitted).  "Substantial evidence means such relevant

21  evidence as a reasonable mind might accept as adequate to support a conclusion." *Morgan*

22  *v. Commissioner of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Vertigan v.*

23  *Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001).  It consists of "more than a mere scintilla but less

24  than a preponderance." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999); *Young v.*

25  *Sullivan*, 911 F.2d 181, 183 (9th Cir. 1990).

26    "In determining whether the Commissioner's findings are supported by substantial

27  evidence, [this Court] must review the administrative record as a whole, weighing both the

28

evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998); *see also Aukland v. Massanari*, 257 F.2d 1033, 1035 (9th Cir. 2001).  However, the ALJ's decision must be upheld if the evidence is reasonably susceptible to more than one rational interpretation, *Allen v. Secretary of Health and Human Services*, 726 F.2d 1470, 1473 (9th Cir. 1984), and the Court cannot substitute its judgment for that of the Commissioner.  *Reddick*, 157 F.3d at 720-21.

The claimant is "disabled" for the purpose of receiving benefits under the Act if he is unable to engage in any substantial gainful activity due to an impairment which has lasted, or is expected to last, for a continuous period of at least twelve months.  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a).  "The claimant bears the burden of establishing a prima facie case of disability." *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996); *Smolen v. Chater*, 80 F.3d 1273, 1289 (9th Cir. 1996).

**IV.  Discussion**

Plaintiff claims that the ALJ should be reversed and benefits awarded for several reasons.  First, she contends that the ALJ erred by discounting her symptom testimony.  Second, Plaintiff argues that the ALJ improperly found that she suffered no mental impairments considered "severe" under the regulations.  Third, Plaintiff claims that the ALJ erroneously rejected the opinion of Plaintiff's treating physician, Michael Gray, M.D., by relying on a one-time examiner's assessment.  The ALJ's decision to discount Plaintiff's symptom testimony and to reject the opinion of Dr. Gray were largely based on the same factors and are therefore addressed in conjunction.

**A.     The ALJ properly assessed Plaintiff's credibility.**

Plaintiff alleges that the ALJ erred in rejecting Plaintiff's testimony concerning her alleged limitations and symptoms without adequate reasons.  (Plaintiff's Motion, pp. 3-10.)  For the reasons explained below, the Court disagrees.

Determinations of a claimant's credibility are to be made by the Commissioner through the ALJ.  *Talifson v. Secretary of HHS*, 554 F.Supp. 575, 580 (D.Mont. 1982).  The ALJ is not required to accept as true every allegation of disabling pain or other non-exertional impairment.  *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007).  If the record establishes the existence of a medically determinable impairment that could reasonably give rise to symptoms described by a plaintiff, the ALJ must make a finding as to the credibility of the plaintiff's statements about the symptoms and their effect on her functional capacity.  *Robbins v. Social Security Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).  Unless affirmative evidence of malingering is found, the ALJ may reject the plaintiff's testimony regarding the severity of her symptoms only if the ALJ makes specific findings stating clear and convincing reasons for doing so.  *Id.*  A reviewing court must give "great deference to credibility determinations made by administrative law judges." *Silver v. United States Postal Service*, 951 F.2d 1033, 1042 (9th Cir.1991).  However, these findings must be sufficiently specific to allow a reviewing court to conclude that the ALJ rejected the claimant's testimony

1   on permissible grounds and did not arbitrarily discredit a claimant's testimony. *Bunnell v.*

2   *Sullivan*, 947 F.2d 341, 345-56 (9th Cir. 1991) (citation omitted).  The ALJ is required to

3   specifically identify the testimony found not to be credible and explain what evidence

4   undermines the testimony. *Holohan v. Massanari*, 246 F.2d 1195, 1208 (9th Cir. 2001).

5   In the instant case, the ALJ's decision not to rely on Plaintiff's subjective complaints

6   is supported by the record.  As Dr. Caffrey aptly noted after examining the Plaintiff, there

7   is a significant difference in opinions among the doctors who have treated and examined

8   Plaintiff.  Here, the ALJ summarized many of the Plaintiff's subjective complaints as he

9   discussed the evidence of Plaintiff's medically determinable impairments.  In refusing to find

10  greater psychological limitations than those ultimately adopted, the ALJ noted that "[d]espite

11  complaints of concentration and memory problems, physicians have described the claimant

12  as an 'excellent historian.'" (Tr. 19.)  In support of this conclusion, the ALJ cited the opinion

13  of Dr. Van De Voorde, statements by Dr. Singer, and the lack of "any longitudinal

14  documentation of a severe mental/emotional impairment or associated treatment." (Tr. 20.)

15  The ALJ also cited other entries in the record that did not support Plaintiff's claims.

16  Dr. Brown performed an IME and indicated that, other than perhaps chronic fatigue

17  syndrome, he was "hesitant to use the term illnesses" in relation to any other previous

18  diagnoses. (Tr. 319.)  Similarly, Dr. Schumacher, after examining Plaintiff and reviewing

19  her medical records, reported that he was "unable to verify an accepted medical diagnosis

20  of an active condition . . . ." (Tr. 559.)  He opined that a diagnosis of toxic encephalopathy

21  was not justified, that diagnoses of fibromyalgia and fibrositis were excluded on clinical

22  grounds, and that "immune toxicity" was not "an accepted medical diagnosis." (Tr. 559.)

23  Later in the decision, the ALJ found that Plaintiff was inconsistent as to the alleged

24  onset date of her disability. (Tr. 25.)  In her motion, Plaintiff argues that this was explainable

25  and that it was unfair of the ALJ to rely on this apparent inconsistency without giving the

26  Plaintiff the opportunity to explain the discrepancy. *Motion*, pp. 5-6.  Even accepting the

27  Plaintiff's position on this point, ample evidence remains to support the ALJ's decision.  For

28

example, the ALJ cited evidence of Plaintiff's "benefit seeking behavior" as undermining her credibility. (Tr. 25.) The ALJ illustrated this point with entries found throughout the record. For example, he cites to the records of Dr. Thrasher, who bluntly stated that much of Plaintiff's medical interventions were "directed at trying to establish causation and proving or disproving the multiple chemical sensitivity issue versus trying to treat her in getting better and more functional and able to return to a productive lifestyle." (Tr. 726.) Relying on *Ratto v. Shalala*, 839 F.Supp. 1415 (D. Or. 1993), Plaintiff asserts that it was improper for the ALJ to rely on the "benefit-seeking behavior" described by Dr. Thrasher to discount Plaintiff's credibility.   In *Ratto*, however, the District Court was critical of the ALJ because, in discounting the claimant's credibility, he relied on the fact that she applied for Title II disability benefits as indicating a "clear secondary gain motivation." *Id*. at 1428.  That is simply not what occurred in this case.   Here, the ALJ relied on medical opinion that expressed doubts about Plaintiff's credibility. Thus, in discounting Plaintiff's credibility, the ALJ was not relying on the act that Plaintiff applied for benefits, but on evidence in the record that called into doubt her claimed inability to work.

**B.    The ALJ's analysis of Plaintiff's mental impairments was valid.**

Plaintiff also agues that the ALJ improperly discounted her mental impairments and their interplay with her physical ailments.   However, as was the case with her physical impairments, there is ample evidence in the record that supports the ALJ's conclusion with regard to Plaintiff's alleged mental impairments. The ALJ's review and analysis of Plaintiff's mental history, and his finding that these impairments were not disabling, is thorough and well-reasoned.  First, the ALJ noted that:

> The clinical record establishes the claimant's mental/emotional problems were intermittent through her date last insured.  She received no ongoing and aggressive mental health treatment. She took no psychiatric medications.  The claimant has never required emergency room or inpatient treatment for psychiatric complaints.

(Tr. 19.)  Turning to Dr. Crago's records, the ALJ notes that she "was seen sporadically" and

that her "symptoms are intermittent and vary in severity" and have shown "improvement with 'a brief course of cognitive rehabilitation.'" (Tr. 19.)  Outside of these factors, Dr. Crago's opinions are strongly favorable to a finding of a mental impairment.  However, the ALJ proceeds to identify entries in the record which legitimately undermine Dr. Crago's opinion:

> Despite complaints of concentration and memory problems, physicians have described the claimant as an "excellent historian."  Her psychological test results in March 2000 were consistent with superior general intelligence, and memory in the average to very superior range.

(Tr. 19 & 325.)  The ALJ next noted examining psychiatrist Dr. Van De Voorde's statement that the results of the tests he conducted on Plaintiff "seem to be at odds with Dr. Crago's conclusions that she was showing overall decline in cognitive abilities." (Tr. 19; *see also* Tr. 22 (additional evaluation of Dr. Van De Voorde's records).)  The ALJ then noted consistent findings from examining physician Dr. Brown. (Tr. 318.)

The reasons cited by the ALJ provide a specific and legitimate basis for rejecting Dr. Crago's evaluation.  As summarized above, the ALJ thoroughly reviewed the record and ultimately refused to find mental limitations indicating disability given Dr. Van De Voorde's assessment and other consistent documentation in the record. These reasons constitute "clear and convincing reasons" for discounting Plaintiff's testimony which are supported by substantial evidence in the record.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007).

**C.      The ALJ provided a valid basis for rejecting Dr. Gray's opinion.**

Plaintiff's final argument is the the ALJ erred by rejecting the assessment of her treating physician, Dr. Gray.  She contends that Dr. Gray's opinion was entitled to controlling weight and should have been adopted because there was no substantial evidence to contradict the opinion.

If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by

substantial evidence. *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995). The Ninth Circuit's standards for evaluating opinions from treating physicians are as follows:

> By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians. *See* 20 C.F.R. § 404.1527. If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight." *Id.* § 404.1527(d)(2). If a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with the other substantial evidence in the record, the Administration considers specified factors in determining the weight it will be given. Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. *Id.* § 404.1527(d)(2)(i)-(ii). Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians. *Id.* § 404.1527(d)(1)-(2). Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and "[o]ther factors" such as the degree of understanding a physician has of the Administration's "disability programs" and their evidentiary requirements' and the degree of his or her familiarity with other information in the record. *Id.* § 404.1527(d)(3)-(6).

*Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).

Here, beginning February 1999, Dr. Gray regularly saw the Plaintiff and identified her problems as immune toxicity, toxic encephalopathy, fibromyalgia, and migraines. (Tr. 385.) Dr. Gray reported that Plaintiff had great difficulty with frequent walking, standing for longer than one hour, performing postural movements, and lifting more than 10 pounds, as well as interacting with people, and maintaining a regular work schedule. (Tr. 416.) On October 14, 1999, Plaintiff told Dr. Gray that "she is unable to work" or "carry out household activities" and stated that she was temporarily totally disabled "with the likelihood that this may become permanent, as I am still unaware of any way that we can desensitize the immune

22

system . . . ." (Tr. 412-413.)  In December of 2000, Dr. Gray repeated his belief that Plaintiff suffered from moderately severe to severe fatigue, depending on chemical exposure and prior exertion, and that she was unable to sustain work activities on a regular and continuing basis. (Tr. 470-71.)  Dr. Gray subsequently maintained the same opinion and documented his belief in the record. repeated his opinion that Plaintiff was disabled. (Tr. 366, 506.)  He recommended that Plaintiff "continue to pursue her efforts at getting a just adjudication of her comp claims and her disability status." (Tr. 506.)

In rejecting Dr. Gray's opinions, the ALJ first noted that the opinions were carefully considered "in view of his role as treating physician," but found that the opinions were not supported by his own clinical and treatment records and were "inconsistent with the substantial evidence in the case record." (Tr. 28.)  The ALJ then noted that Dr. Gray had uncritically accepted Plaintiff's subjective reports of symptoms and limitations, but that Dr. Brown and Dr. Thrasher characterized Dr. Gray's diagnosis and treatment of Plaintiff as "fringe medicine" and "not supported by mainstream scientific medicine." (Tr. 28.)  In reviewing these specific references, and in light of the record as a whole, it is evident that the ALJ reviewed the record in its entirety and concluded that Plaintiff suffered from no physical limitations and was only "subject to environmental limitations consisting of the need to avoid respiratory irritants." (Tr. 29.)  The record was reasonably interpreted by the ALJ as supporting his conclusion that Dr. Gray's opinions were not "well-supported by medically acceptable clinical and laboratory diagnostic techniques . . . ." *Orn*, 495 F.3d at 631 (quoting 20 C.F.R. § 404.1527(d)(2)).  Although the record could rationally be interpreted as supporting a finding favorable to Plaintiff, it also was rational for the ALJ to interpret the record as he did.  It therefore would be improper for the Court to reject the ALJ's determination in this case.

**RECOMMENDATION FOR DISPOSITION BY THE DISTRICT JUDGE**

Based on the foregoing and pursuant to 28 U.S.C. § 636(b) and Local Rule 1.17(d)(2),

23

Rules of Practice of the United States District Court, District of Arizona, the Magistrate Judge recommends that the District Court, after an independent review of the record, **DENY** Plaintiff's Motion for Summary Judgment [Doc. No. 14] and **GRANT** Defendant's Cross-Motion for Summary Judgment [Doc. No. 21].

This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.

However, the parties shall have ten (10) days from the date of service of a copy of this recommendation within which to file specific written objections with the District Court. *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure. Thereafter, the parties have ten (10) days within which to file a response to the objections. If any objections are filed, this action should be designated case number: **CV 07-335-TUC-FRZ**.  Failure to timely file objections to any factual or legal determination of the Magistrate Judge may be considered a waiver of a party's right to *de novo* consideration of the issues. *See United States v. Reyna-Tapia* 328 F.3d 1114, 1121 (9th Cir. 2003) (*en banc*).

DATED this 18th day of November, 2008.

Jacqueline Marshall
United States Magistrate Judge